[No. 28822.   *En Banc.*   February 1, 1943.]

EDITH A. CHRISTENSEN, *as Administratrix, Appellant,* v. WEYERHAEUSER TIMBER COMPANY, *Respondent.*[1]

[1] Reported in 133 P. (2d) 797.

*Sam L. Levinson, Frank M. Allyn,* and *Jay Friedman,* for appellant.

*Wright, Innis & Simon (Rucker & Burnett* and *Clark A. Eckart,* of counsel), for respondent.

STEINERT, J.—This action was instituted by Edith A. Christensen, administratrix of the estate of Christian Christensen, deceased, on her own behalf as his widow

and on behalf of their minor daughter, to recover damages from the defendant, Weyerhaeuser Timber Company, for the death of the husband and father. The complaint alleged that, because of defendant's negligent maintenance of its wharf and certain electrical apparatus thereon, the decedent, while in the performance of his duties as a member of a visiting ship's crew, sustained an electrical shock causing him to fall from the edge of the wharf into the water beneath and drown. Defendant's answer consisted of a general denial and an affirmative defense of assumption of risk.

The action was tried before the court and a jury. At the close of the plaintiff's case, the court sustained defendant's challenge to the sufficiency of the evidence, upon two grounds: (1) That, although the decedent may have met his death in the manner contended by the plaintiff, his legal relationship to the defendant at the time was merely that of a licensee, to whom the defendant owed only the duty of not injuring him wantonly or willfully, and that plaintiff's evidence was not sufficient to establish negligence in that degree on the part of defendant; and (2) that, were it adjudged that the decedent was at the time an invitee, rather than a licensee, and that the defendant was at the same time guilty of negligence in failing to exercise, for the protection of invitees, reasonable care in the maintenance of its wharf and electrical equipment, still the evidence was insufficient to take the case to the jury upon the question whether defendant's negligence was the proximate cause of the death.

After denying plaintiff's motion for a new trial, the court entered judgment dismissing the action, whereupon the plaintiff appealed. The assignments of error relate to the two grounds upon which the trial court sustained the challenge to the sufficiency of the evidence to take the case to the jury.

The facts, according to the evidence adduced by the appellant, are as follows: Respondent, Weyerhaeuser Timber Company, a corporation, was the owner of a mill, commonly known as Mill A, in Everett, Washington. In connection with this mill, it maintained a wharf, or pier, at which vessels would moor for the purpose of taking aboard the company's lumber products. The wharf was built upon piling, was between five hundred and six hundred feet in length, from north to south, and in a general way paralleled the shore. It was approximately one hundred feet wide, measured from east to west. The inshore, or easterly, side of the wharf stood about two hundred or three hundred feet out from shore, and a causeway led landward from each end of the pier to the mill proper, thus preventing access by seagoing vessels to the inshore side of the wharf. Vessels were loaded only from the offshore side, while the inshore side was used exclusively for purposes of storing lumber intended for shipment.

Along the inshore side of the wharf, about a foot from the edge thereof, was a row of square poles, or standards, about thirty feet high and approximately seventy-five or one hundred feet apart. Upon the top of each of these poles was a flood light, with a reflector attachment, which at night illuminated the offshore, or loading, edge of the wharf, leaving an area of semidarkness around the foot of the pole. This action involves only one of these poles and the area immediately surrounding it.

On this particular pole, which was situated about midway in the length of the wharf, was a fixture commonly known as a Benjamin fitting, devised to serve as an electrical outlet for plugging in auxiliary extensions and transmitting a current of one hundred ten volts. This fixture was attached to the side of the pole,

facing west, and was located approximately four or five feet above the floor level of the wharf. The wire leading into the Benjamin fitting came down from the top of the pole in a pipe conduit about three-fourths of an inch in diameter. Immediately below the Benjamin outlet, and connected with it by a metal pipe through which the wire ran, was a box with a thumb switch on the right-hand side. There was no ground wire from either the outlet or the switch box.

Immediately above the Benjamin fitting, a small piece of canvas was tacked to the pole and hung down as a loose cover over the outlet. In rainy weather this canvas, on becoming saturated with water, would tend to droop against the outlet and come in contact with the hand of a person seeking to make an electrical connection at the fixture. In case of an electrical leakage at that point, in wet weather, a person seeking to make such connection would run the risk of receiving a shock.

There was evidence from which the jury could have found that the Benjamin outlet and the switch immediately below it were improperly installed in that there was no ground wire to take away any leaking current, and, further, that the canvas cover was not a proper covering in wet weather. The other poles along the wharf also had similar outlets, but with these we are not here concerned.

The planks forming the floor of the wharf in the vicinity of the particular pole were staggered and of uneven length, some of them projecting a foot or more beyond the others, along the inshore edge of the pier. There was no string-piece or guardrail at the margin of the structure and, as already stated, the pole stood within a foot of the inner edge of the wharf. At the time here in question, considerable lumber was piled close by the pole, and near it also lay a fifteen-foot

spar. In wet weather, the deck of the wharf became slippery.

On December 24, 1940, and for several days preceding, the steam schooner "James W. Griffiths," which was owned and operated by an independent company, was moored to the offshore side of the wharf, at a point opposite the pole above described, and during that interim was engaged in taking on a cargo of lumber. For some years before, the vessel had called regularly at respondent's dock for lumber, which it transported south, and had frequently tied up at this particular wharf. On such occasions, it had been the practice of those in charge of the vessel to shut off its engines and generators at night after the loading operations of the day had ended. At the same time, the employees of the ship would stretch a cable from the vessel to one of the poles and plug it into the Benjamin fitting, thus enabling them to have electric light upon the ship during the night and until the ship's generators were again put in operation. There was testimony to the effect that this was the general practice of the ship's employees wherever and whenever a shore connection was available during the period of the loading operations at a particular wharf. There was no evidence, however, that the respondent in this case had agreed or obligated itself to furnish electricity to the ship at any time or for any purpose, or that the appropriation of such electricity, as above described, by the ship and its crew for lighting purposes was other than permissive on the part of the respondent.

On the night of December 23, 1940, the second assistant engineer of the "James W. Griffiths," to whom had been assigned the task of connecting the ship's cable to the Benjamin outlet, made this connection at about nine o'clock. The engines and generators of the ship were at that time shut down, not to be started

again until five o'clock the following morning in preparation for the loading operations to continue on that day. It was similarly the duty of the deceased, Christian Christensen, first assistant engineer, who was the engineer in charge of the watch beginning at five o'clock on the morning of December 24th, to take in the cable at that hour, after disconnecting it from the outlet attached to the pole on the inner edge of the wharf.

Three members of the crew who went ashore the early part of the evening of December 23rd, returned about one o'clock the next morning. One of them testified that, according to his recollection, the wharf was very dark on their return and that it was necessary for one of the men to use a flashlight in order to get around; that, when they got aboard ship, the vessel was without lights; and that they had to use kerosene lamps until they retired.

Shortly after five o'clock in the morning, a crew member, whose duty it was to call Christensen, reported that he was not in his room. Another crew member then went to Christensen's quarters and noted that his bed had been occupied; that the alarm clock had been set for five o'clock; and that the alarm spring had not run entirely down. Further search of the vessel failed to reveal any trace of Christensen. The master was then notified, and, after an additional search without results, the police were called.

About eleven o'clock in the forenoon of December 24th, the captain of the Everett police arrived, accompanied by a newspaper reporter. At that time it was raining quite hard, as it had been for some time previously, and the deck of the wharf was very wet. During the course of the investigations then made, the reporter out of curiosity touched the thumb switch located immediately below, and connected with, the

Benjamin outlet, and received a shock which, though not severe, caused him to jump backwards. He was about to repeat the venture when he was warned by the captain not to do so.

The coast guard was then summoned. Four coast guardsmen appeared, bringing with them a dragging machine. The machine was lowered into the water at the base of the pole above described, and upon the first operation Christensen's body was recovered. It was clad in coveralls. The coroner was then called, and later a post-mortem examination was made. No evidence of electrical shock was discovered upon the body. The coroner testified, however, that the symptoms of death by electrical shock and those by drowning were very similar, as both were the result of death by asphyxiation, and that frequently persons would receive a shock severe enough to cause death without leaving upon the body any visible evidence of burns. He further testified that an electrical shock would usually cause an intense muscular spasm, and that the person receiving it would lose all control over his actions and might fall in any direction.

The deceased was forty-seven years of age at the time of his death. He had been in good health, had no bad habits, was devoted to his family, and was shortly to be promoted to a position carrying a substantial increase in salary.

The basis of this action is the alleged negligence of the respondent in failing to perform the legal duties devolving upon it. In determining the question of what its duties were, so far as the deceased was concerned, the legal relationship between the parties must be considered. *Garner v. Pacific Coast Coal Co.*, 3 Wn. (2d) 143, 148, 100 P. (2d) 32, 35.

The first question presented upon the appeal, then, is whether the evidence was sufficient to warrant a

finding that the deceased, at the time and place of his death, was an "invitee" of the respondent, rather than a mere "licensee," as those terms are understood in the law. Unless the deceased was an invitee there can be no recovery in this case, for there is no evidence, nor does appellant contend, that the deceased came to his death through wanton or willful negligence on the part of the respondent.

It is the rule in this state that the only duty which the owner of premises, or the proprietor of a business conducted thereon, owes to a mere licensee is the duty not to injure such licensee wantonly or willfully. *Buttnick v. J. & M., Inc.,* 186 Wash. 658, 59 P. (2d) 750; *Garner v. Pacific Coast Coal Co., supra; Schock v. Ringling Bros. and Barnum & Bailey Combined Shows,* 5 Wn. (2d) 599, 105 P. (2d) 838. The rule as thus expressed does not exclude liability on the part of the owner or proprietor for extraordinary concealed perils against which the licensee cannot protect himself, or for unreasonable risks incident to the possessor's activities. Such exceptional circumstances, however, are not involved here.

An invitee is one who is either expressly or impliedly invited onto the premises of another for some purpose connected with the business in which the owner or occupant of the premises is then engaged, or which he permits to be conducted thereon; and to establish such relationship, there must be some real or supposed mutuality of interest in the subject to which the visitor's business or purpose relates. *Gasch v. Rounds,* 93 Wash. 317, 160 Pac. 962; *Kinsman v. Barton & Co.,* 141 Wash. 311, 251 Pac. 563; *Garner v. Pacific Coast Coal Co., supra; Schock v. Ringling Bros. and Barnum & Bailey Combined Shows, supra;* 4 Shearman & Redfield, Law of Negligence (Rev. ed.), § 779, p. 1785.

■ A licensee is one who goes upon the premises of another, either without any invitation, express or implied, or else for some purpose not connected with the business conducted on the land, but goes, nevertheless, with the permission or at the toleration of the owner. *Kinsman v. Barton & Co., supra; Holm v. Investment & Securities Co.,* 195 Wash. 52, 79 P. (2d) 708; *Schock v. Ringling Bros. and Barnum & Bailey Combined Shows, supra;* note (1925) 36 A. L. R. 37.

■ Assuming that the deceased met his death by falling or being thrown from the eastern, or inner, edge of the wharf, there is no evidence in this case that his presence at that point came about through any *express* invitation on the part of the respondent. If any invitation is to be found in the circumstances, it must be one by implication.

The cases hereinbefore cited all hold that the true test for determining whether there has been implied invitation to come upon the premises of an owner or occupant is mutuality of interest in the subject to which the business of the visitor relates. In *Gasch v. Rounds, supra,* wherein this court definitely expressed such to be the test, we adopted the so-called Massachusetts rule as expounded in *Plummer v. Dill,* 156 Mass. 426, 31 N. E. 128, 32 Am. St. 463, in the following quoted paragraph:

"It is well settled there [England] that to come under an implied invitation, as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged, or which he permits to be carried on there. There must be at least some mutuality of interest in the subject to which the visitor's business relates, although the particular thing which is the object of the visit may not be for the benefit of the occupant."

■ In this connection, it is also the rule that liability upon an implied invitation is limited by the

extent of the invitation and does not extend to injuries received on a portion of the owner's premises not covered by the invitation. In 38 Am. Jur. 761, Negligence, § 100, it is said:

"An owner or occupant is liable for an injury sustained by a person, who entered the premises by invitation, as a result of a defective condition of the premises only where the part of the premises upon which the injury was sustained was covered by the invitation. If a person, although on the premises by invitation, goes to a place not covered by the invitation, the owner's duty of care owed to such person as an invitee ceases forthwith."

See, also, 45 C. J. 830, Negligence, § 240; 4 Shearman & Redfield, Negligence (Rev. ed.), § 779, p. 1787.

In this case the burden was, of course, on the appellant to prove that the respondent was negligent in the performance of some duty owing to the deceased, for the essential elements of actionable negligence are (1) the existence of a duty, (2) a breach thereof, and (3) a resulting injury. Since the respondent could be held liable, if at all, only upon the theory that the deceased was an invitee at the particular time and place of the alleged injury resulting in his death, the burden rested on the appellant to prove that, as to the respondent, the deceased then and there occupied the legal relationship of an invitee. We do not believe that appellant has met that burden.

It is appellant's theory that the deceased lost his life some time after five o'clock in the morning, while endeavoring to make a connection, or disconnection, between the ship's electrical extension cable and the Benjamin fixture located on the pole near the inner edge of the wharf. The ship and its crew were not engaged in loading operations at that time, nor was the pole located in the area where the activities

of the crew in connection with loading operations were performed. Furthermore, the pole was not on the side of the wharf where ships moored, or could moor, and was nowhere near the path of ingress and egress between the ship and the mill proper or points beyond on the shore. On the contrary, the pole stood on the extreme inner edge of the wharf, one hundred feet from the ship, two hundred fifty or three hundred feet from either causeway over which access to and from the ship was gained, and in an area devoted exclusively to storage purposes. It is also to be noted that appellant makes no contention that the deceased was endeavoring to reach the shore by way of one of the causeways or that he was anywhere in that area. Cases involving the duty of a dock owner to exercise reasonable care in the maintenance of, and to provide protection against injury on, that portion of his wharf used by a ship's crew in loading operations, or that portion used, or expected to be used, by the crew for purposes of ingress and egress between the ship and the shore, are therefore not in point here.

Most important of all is the fact that the evidence fails absolutely to disclose any mutuality of interest between respondent on the one hand and the ship owners and their employees on the other, in the alleged errand of the deceased at the time immediately preceding his death. There is no showing of any agreement or understanding between the respondent and the owners of the ship whereby the respondent obligated itself to furnish electricity to the vessel after it had shut down its generators. There is no showing of any benefit to the respondent in having lights on the ship after loading operations for the day had ceased. It was of no concern to the respondent how the ship, when idle, maintained its lights, whether by its own

generators continuing to function as in the daytime, or whether by kerosene lamps after the generators had shut down. In fact, it did not matter to the respondent whether the ship then had lights at all. The saving of fuel by the vessel in shutting down its engines in no way affected the respondent.

It is true that the ship, through the members of its crew, made use of respondent's facilities by plugging a cable into the Benjamin fitting on the farther side of the wharf, but so far as the record discloses that was at most simply by permission of the respondent. In any event, the practice employed was solely for the benefit of the ship and its crew, and had nothing to do with any operation in which the respondent was concerned. Permission without mutuality of interest, however, simply constitutes a license, not an invitation; nor does long-continued use by permission convert a licensee into an invitee, for, as stated by Judge Pound, in *Vaughan v. Transit Development Co.*, 222 N. Y. 79, 118 N. E. 219, "the law does not so penalize good nature or indifference nor does permission ripen into right."

The case of *Kinsman v. Barton & Co.*, 141 Wash. 311, 251 Pac. 563, furnishes a good illustration of the principle here involved. In that case, it appears that the defendant operated a large meat-packing plant and in connection therewith had constructed a garage for housing its various trucks. The defendant's employees had formed the habit, with defendant's knowledge, of parking their private cars in the garage. Adjacent to the garage was a small room which the defendant allowed plaintiff's employer to use for maintaining a restaurant without paying any rent therefor. Defendant's employees and the general public customarily patronized the restaurant. The tenant and her employees, including the plaintiff, also made a practice

of going through the garage to defendant's offices for the purpose of using the telephone and lavatory. One morning, plaintiff in going to her work at the restaurant rode with one of defendant's employees in the latter's automobile. The car was driven into the garage and parked. On alighting from the automobile, the plaintiff stepped into a hole in the floor of the garage and was injured. Upon this state of facts, this court said:

"It is our opinion that the appellant [plaintiff] was a mere licensee, and not an invitee. The respondent [defendant] rented to the appellant's employer only the restaurant room. If the tenant or her employees found it convenient to use respondent's telephone or lavatory, and to go through the garage for that purpose, it was solely for their own benefit. They were no part of the rented premises. So, also, with reference to the garage. It was no part of the restaurant. If the appellant had driven her own car therein and, in alighting therefrom, had been injured, she would have been merely a licensee, to whom the respondent owed no duty of care. In making such use, there would be no community of interest between the appellant and the respondent. She would not, in any manner, be engaged in the business of respondent, or in anything which would be of interest to it. It is true, that respondent permitted private automobiles to be temporarily parked in the garage; but simple permission does not make one an invitee. Permission and community of interest are necessary. But permission is the only element making up the relationship of a licensee, and without it the person would become a trespasser. Under the facts of this case, respondent did not invite appellant to use either the telephone or garage. It did nothing more than permit her to use them. Whether she or her employer used them was a matter of indifference to it."

Appellant cites two of our cases defining the duties which the owners of docks and wharves owe to invitees on the premises: *Alaska Pacific Steamship Co.*

438

*v. Sperry Flour Co.,* 107 Wash. 545, 182 Pac. 634, 185 Pac. 583; and *Nelson v. Booth Fisheries Co.,* 165 Wash. 521, 6 P. (2d) 388. In both of those cases, however, the negligence complained of was the failure of the owner to exercise reasonable care in maintaining a safe approach from the shore to the ship. The law is well established that the owner of business premises must use reasonable care in keeping in a reasonably safe and secure condition such portions of his premises as are constructed for use, or intended to be used, as a means of approach or access to the premises by those entitled or invited to use them. In both of those cases also is found the element of mutuality of interest, in that the injured person was at the time engaged in an activity in which the owner was directly or indirectly concerned or from which he received a benefit. The situation here is entirely different, as demonstrated above.

Appellant also cites a group of cases from other jurisdictions, but those cases likewise involve situations where the injured parties were clearly invitees and are therefore distinguishable from the case *sub judice.* In view of what we have heretofore said, we now hold that the deceased was, at the time and place of his death, a mere licensee, and not an invitee, of the respondent, and that, since there is no proof of wanton or willful negligence on the part of the respondent, there is no basis for recovery.

The second question presented upon the appeal is: Assuming that the legal status of the deceased at the time of his death was that of an invitee rather than that of a licensee, was the evidence sufficient to take the case to the jury on the question as to whether respondent's negligence was the proximate cause of the death? The trial court held that the evidence was

insufficient upon that issue. While we agree with the view taken by the trial court upon this second question, our decision upon the first question disposes of the case and renders unnecessary any extended discussion of the second query.

The judgment is affirmed.

SIMPSON, C. J., BEALS, ROBINSON, JEFFERS, and GRADY, JJ., concur.

BLAKE, J. (dissenting)—I dissent. Under the facts stated in the opinion, I think the deceased was an invitee to whom respondent owed the duty of reasonable care. Also, I think the evidence sufficient to take the case to the jury on the questions of negligence and proximate cause.

MILLARD and MALLERY JJ., concur with BLAKE, J.