[No. 2708–2. Division Two. August 16, 1978.]

A. E. Egede–Nissen, *Respondent,* v. Crystal
Mountain, Inc., *Appellant.*

*Robert J. Grenier,* for appellant.

*Kirk R. Wines,* for respondent.

REED, A.C.J.—Crystal Mountain, Inc., defendant below, appeals from a judgment entered in favor of plaintiff Astrid

Egede–Nissen. We find merit in some of the many assign-
ments of error raised by Crystal Mountain and reverse.

Crystal Mountain owns and operates a ski resort on pub-
licly owned land. The land itself is at all times open to the
general public for skiing, hiking, and other recreational
purposes; Crystal Mountain merely has been granted a per-
mit to operate recreational ski facilities at the site. These
facilities include a ski lodge, a large parking lot, and a
number of chair lift and rope tows, used to take skiers to
various elevations on the mountain.[1]

On Wednesday, April 25, 1973, the lodge and lifts were
not open for business; the only lift operating was the C–4
aerial tramway (the "Quicksilver Lift"), which was being
run as an accommodation for the K–2 Corporation (K–2), a
company that manufactures skis. Two professional skiers
and an engineer from K–2 were apparently the only people
using the facility. There were no lift operators or ticket
sellers in the area. On that date plaintiff, a cabin attendant
for Scandinavian Airlines System (SAS), and several mem-
bers of her flight crew drove to the Crystal Mountain area
for a picnic. The members of the group did not have ski
equipment with them and they had no plans to ski. The
group hiked up to the loading area of the C–4 and C–5 lifts
in order to find a suitable place to eat. At this time they
noticed that the C–4 lift was operating, and spied the K–2
skiers past the "quarterway" station on the mountain. Use
of the lift was discussed by plaintiff's group and Captain
Reidar Hartvedt decided to ride the lift and speak with the
skiers about possible picnic sites. Hartvedt successfully
boarded the moving chair; however, plaintiff, who suddenly
decided to join the captain, slipped and somehow wound up
with her feet dangling over the back of the chair. As the
chair carried her up the mountain, Captain Hartvedt man-
aged to place his legs under plaintiff's body to stabilize her.

---

[1]Although Don Christianson, vice–president and area manager of Crystal
Mountain, stated that nonskiers also occasionally used the lifts, he testified that
only a very small part of Crystal Mountain's income was derived from this source.

They planned to remain in this position until they reached the quarterway station on the mountain, at which point they believed plaintiff could be dropped gently onto the loading platform.

The major factual dispute in the case revolves around the extent of defendant's efforts to cordon off the loading area of the C–4 lift or warn away visitors. Plaintiff's witnesses, the other SAS crew members, testified that the loading area was not blocked and that there were no warning signs present. In fact, Tollef Bakke, the SAS copilot, testified that the only writing he noticed were two phrases written on a blackboard: "400 yards to go" and "You see what you get." Captain Hartvedt also stated that he read the phrase "You see what you get" on the blackboard. In contrast, defendant's witnesses, all employees of Crystal Mountain, stated that the area was surrounded by metal rope and fencing, and that a "Sorry Lift Closed" sign had been posted.

In any case, several of defendant's employees observed plaintiff hanging from the chair and became alarmed. Bill Steel, defendant's "mountain manager" and Paul Swanson, the lift supervisor, attempted to drive from the C–1 lift area where they had been working to the C–4 compound. Their truck became mired in the snow about half way to their destination; they left the vehicle and Steel ran to the bottom of the lift where the controls were located, while Swanson headed toward Tower 3 of the C–4 lift. Upon reaching the controls, Steel immediately stopped the lift. The chair began to sway after the stop and plaintiff lost her previously firm grip on the seat. Captain Hartvedt grabbed plaintiff's wrists and at least temporarily was able to keep her from falling. Hartvedt and plaintiff both yelled for the men to restart the lift. Swanson, who was quite experienced in all phases of lift emergency procedures, was either not aware of plaintiff's plans concerning the quarterway station or was convinced that they were unrealistic. He determined that the safest course of action would be for him to climb Tower 3, scale the guide wire to the chair in which plaintiff

and Hartvedt were riding and pull plaintiff into the chair. He signaled Steel to restart the lift; when he believed that the chair was close to Tower 3, Swanson, through arm motions, requested that Steel again stop the lift. After the second stop, the chair began to sway more violently. Hartvedt shouted that he was unable to keep his hold on the plaintiff. Plaintiff dropped 30 feet to the ground and sustained multiple fractures.

Plaintiff initiated this action for damages on June 7, 1973. At trial, she alleged that defendant was negligent in basically three aspects: (1) in failing to use reasonable care to exclude members of the public from the lift area; (2) in operating the lift without attendants; and (3) in failing to exercise reasonable care in rescuing plaintiff. After a heated trial, the jury returned special interrogatories finding that defendant was negligent, that plaintiff's damages were $150,000 and that plaintiff was 55 percent "contributorily negligent." Judgment was entered accordingly and defendant appeals.

The first cluster of issues to be discussed concerns the extent of the duty owed by Crystal Mountain to plaintiff. Defendant objects to the trial judge's use of a number of jury instructions regarding this issue; we are primarily concerned with instruction No. 20, which states:

> If an owner or occupier of land which is open to the general public wishes to exclude the general public from any particular portion of such land, or from any instrumentality maintained on such land, he must use reasonable care to do so. *The failure to use reasonable care is negligence.* Such negligence has the same effect as any other act of negligence. Therefore, it will not render a defendant liable for damages unless you further find that it was a proximate cause of the claimed injury or damage.

(Italics ours.)

■ This instruction correctly assumes that plaintiff's status upon arriving at Crystal Mountain was that of a public invitee, and that Crystal Mountain therefore owed her a duty of reasonable care, see Restatement (Second) of Torts § 332 (2) (1965); *McKinnon v. Washington Fed. Sav.*

*& Loan Ass'n,* 68 Wn.2d 644, 414 P.2d 773 (1966); 62 Am. Jur. 2d *Premises Liability* § 116 (1972). The instruction, however, confuses the questions of the scope of the invitation and the existence of a breach of the applicable duty. An owner or occupier of land has the duty to maintain the premises in a reasonably safe condition for the protection of an invitee; he must further make any limitation on the scope of the invitation apparent to a reasonable invitee. *Mesa v. Spokane World Exposition,* 18 Wn. App. 609, 570 P.2d 157 (1977); W. Prosser, *Law of Torts* § 61 (4th ed. 1971); *cf. Miniken v. Carr,* 71 Wn.2d 325, 428 P.2d 716 (1967). As stated in W. Prosser, *supra* at 391–92:

> The special obligation toward invitees exists only while the visitor is upon the part of the premises which the occupier has thrown open to him for the purpose which makes him an invitee. This "area of invitation" will of course vary with the circumstances of the case. . . . it extends to all parts of the premises to which the purpose may reasonably be expected to take him, and to those which are so arranged as to lead him reasonably to think that they are open to him.

(Footnotes omitted.) We note that instructions Nos. 17 and 31, excepted to by Crystal Mountain, correctly state this concept.[2]

An occupier is not an insurer of the safety of his invitees. Failure to make a reasonable effort to exclude an invitee from an area intended to be private is not negligence; it merely expands the "area of invitation" to include

---

[2]Instruction No. 17 provides:

"The duty of defendant Crystal Mountain in the maintenance of their premises is to use ordinary care to make the premises reasonably safe for the public. This duty is limited to that part of the premises designed, adapted and prepared for the accommodation of the public or to which the public may be reasonably expected to go."

Instruction No. 31 states:

"The operator of a ski resort facility owes to a person who has an express or implied invitation to come upon the premises a duty to exercise ordinary care for his safety. This includes the exercise of ordinary care to maintain in a reasonably safe condition those portions of the premises which such person is expressly or impliedly invited to use or which he might reasonably be expected to use."

those parts of the premises which the invitee reasonably believes are open for his use. W. Prosser, *supra; cf. Engdal v. Owl Drug Co.*, 183 Wash. 100, 48 P.2d 232 (1935); Restatement (Second) of Torts § 332, comment *l* (1965). To rephrase, an owner or occupier is generally responsible for maintaining his land in a reasonably safe condition for the benefit of his invitees; this duty extends only to those parts of the property which are in the scope of the invitation. *Christensen v. Weyerhaeuser Timber Co.*, 16 Wn.2d 424, 133 P.2d 797 (1943). Visitors who roam into the clearly "private" areas of the premises become either trespassers or licensees—and the owner or occupier need merely refrain from engaging in willful or wanton misconduct.[3] *Miniken v. Carr, supra* (includes duty to warn licensee of dangers known to owner or occupier of land but concealed from visitor); *Winter v. Mackner*, 68 Wn.2d 943, 416 P.2d 453 (1966); *Evans v. Miller*, 8 Wn. App. 364, 507 P.2d 887 (1973). On the other hand, an owner or occupier of land who fails to make a reasonable effort to apprise an invitee of the limits of the invitation becomes responsible for maintaining all the "apparently public" sections of the premises in a nonnegligent manner. Only if that duty is breached, is the owner or occupier negligent and liable for the damages flowing from his actions.[4]

As instruction No. 20 permitted the jury to find Crystal Mountain guilty of negligence simply for failing to make a

---

[3] The modern trend has been to blur the distinction between standards of care owed to invitees and licensees. *See Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975); Bohrnsen & Ryan, *Tort Law in Washington: A Legal Chameleon*, 11 Gonz. L. Rev. 73, at 110 *et seq.* (1975).

[4] We must acknowledge that Division Three of this court analyzed this problem somewhat differently in the case of *Mesa v. Spokane World Exposition*, 18 Wn. App. 609, 570 P.2d 157 (1977). Our research has convinced us that the question of the scope of an invitation is best understood as involving the "duty" element of the basic negligence paradigm. *See Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969); *Swiss Baco Skyline Logging, Inc. v. Haliewicz*, 18 Wn. App. 21, 567 P.2d 1141 (1977). The *Mesa* court assumed that the failure to exclude plaintiff from an area intended to be private was, in itself, a breach of the duty of reasonable care. In this respect, that decision does not accord with our view.

reasonable effort to exclude the public from the lift area, it was improper. We cannot find that use of the instruction was harmless, and therefore, must reverse and grant a new trial. Although our holding on the use of instruction No. 20 makes it unnecessary for us to consider the remainder of Crystal Mountain's assignments of error, we will address the major issues in order to avoid possible error at the new trial.

Resolution of the remaining problems regarding the duty of care instructions is quite simple. The question of the scope of an invitation is one of fact, *Mesa v. Spokane World Exposition, supra;* 2 F. Harper & F. James, *The Law of Torts* § 27.12, at 1487 (1956). As there was sufficient evidence in the record to make the question of the reasonableness of defendant's efforts to exclude plaintiff from the C–4 lift a matter for the jury, we find that the trial court was correct in refusing defendant's "trespass as a matter of law instruction." Although Crystal Mountain was entitled to instructions regarding the duty owed plaintiff should the jury conclude that plaintiff had strayed beyond the "area of invitation" in boarding the lift, such an instruction was not requested. The remainder of defendant's proposed instructions regarding trespassers (Nos. 24, 25, 27, 28, 29, 30, 31) are meaningless without an appropriate charge concerning the circumstances under which plaintiff could rightly be found to have been a trespasser; it was therefore not error to refuse to give them.

Defendant's dissatisfaction with the language of instruction No. 18 appears to be justified.[5] Instruction No. 18 is the "reverse" of the trespass as a matter of law instruction,

---

[5]Instruction No. 18 reads:

"The owner and operators of a recreational transportation device, such as a chairlift, must use that degree of care which a reasonably prudent owner and operator would exercise under similar conditions or circumstances. In considering the care to be used, you must take into account the dangers, if any, to be encountered in the normal use of the device and in such uses as the owner and operators should have expected the device to have been put in the exercise of reasonable care. Failure to use such reasonable care is negligence."

for it assumes that plaintiff was an invitee as a *matter of law* when she boarded the lift. As stated previously, the scope of the invitation to a public invitee is a question for the trier of fact; this instruction would have been proper if preceded by a sentence informing the jury that the charge was relevant only if it found that Crystal Mountain did not make a reasonable attempt to exclude plaintiff from the lift. As it stands, this instruction is incorrect, and should not have been used.

Defendant also assigns as error the failure to give its requested instruction No. 17, the sudden emergency instruction. This charge incorporates the language of WPI 12.02, 6 Wash. Prac. 82, and reads as follows:

> A person, who is suddenly confronted by an emergency through no negligence of his own and who is compelled to decide instantly how to avoid injury and who makes such a choice as a reasonably careful person placed in such a position might make, is not negligent even though he does not make the wisest choice.

■ Defendant contends that plaintiff's position on the lift was so startling and dangerous as to constitute an emergency in the minds of defendant's employees. Crystal Mountain further argues that although Swanson and Steel may not have undertaken to rescue plaintiff in the "wisest" possible manner, their actions were reasonable under the circumstances, and therefore not negligent. We agree that there was substantial evidence introduced in this case to support an instruction regarding the emergency doctrine. *Haynes v. Moore,* 14 Wn. App. 668, 545 P.2d 28 (1975).

We will next address questions raised concerning instructions Nos. 14 and 15;[6] these instructions concern

---

[6]Instruction No. 14 states:

"The violation, if you find any, of the safety standards governing recreational facilities adopted by the Department of Parks and Recreation of the State of Washington, as they existed at the time of the incident, is negligence as a matter of law. Such negligence has the same effect as any other act of negligence. Therefore, it will not render a defendant liable for damages unless you further find that it was a proximate cause of the claimed injury or damage."

plaintiff's theory that Crystal Mountain's violation of certain standards allegedly promulgated by the Washington State Department of Parks and Recreation is negligence per se. Crystal Mountain objected to these instructions because it believed that conformance with safety standards was required only when the facility was "open for business." Curiously, no inquiry was made to determine if the standards referred to by plaintiff had ever actually been adopted by the Department of Parks and Recreation. The safety standards summarized in instruction No. 15 are those found in §§ 3.2.1.1 through 3.2.2.2 of the American National Standard Safety Requirements for Aerial Passenger Tramways, American National Standards Institute, Inc. (1975) (ANSI). Although WAC 352–44–060 states that the ANSI standards "shall apply to the *design* and *inspection* of all conveyances as interpreted by the Director" (italics ours), it does not purport to incorporate those provisions of the ANSI code dealing with the *operation* of aerial tramways.[7] The only Washington administrative regulation concerning operators and operational procedures in effect at the time of this accident was WAC 352–44–090, which merely directs that a committee be formed "to consider and recommend a set of guidelines and minimum standards for the operators and the safe operation of conveyances." To date, no such guidelines have been adopted.

■ The ANSI code appears to be at least somewhat probative on the question of whether Crystal Mountain

Instruction No. 15 reads:

"A regulation of the Department of Parks and Recreation of the State of Washington requires that when a chairlift is in regular operation for the recreational transportation of passengers:

"(1) One or more persons familiar with emergency procedures is to be on the site of the facility;

"(2) An operator shall be in charge of each aerial lift;

"(3) One attendant shall be on duty at each loading and unloading area.

"(An operator may serve concurrently as an operator and an attendant at a loading or unloading area that may be adjacent to the operator's station.)"

[7]In any event, our reading of WAC 352–44–060 leads us to believe that the Department of Parks and Recreation intended the ANSI code merely to serve as a

140

breached its duty to plaintiff. As the admission of another publication of the American Standards Institute has been upheld against a hearsay objection, we see no barrier in plaintiff's using defendant's failure to comply with ANSI standards as evidence of negligence. *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 453 P.2d 619 (1969). Plaintiff is not, however, entitled to an instruction that violation of ANSI code §§ 3.2.1.1 through 3.2.2.2 is negligence per se; instructions Nos. 14 and 15 must therefore fall.

At trial defendant objected to the admission of plaintiff's exhibit 12, the Riblet Tramway Operating Instruction Manual.[8] Chair lift C–4 was manufactured by Riblet Tramway Company, Inc. The manual is supplied by Riblet to Crystal Mountain and includes a description of the C–4 lift, operating instructions, maintenance information and service specifications. Although the issues surrounding the admission of this document are rather garbled, it appears that plaintiff intended to use the booklet for three purposes.

The first two purposes for which the manual was admitted involve a factual dispute regarding the operation and capacity of the braking mechanisms of the tramway. The C–4 lift is equipped with three braking systems: one normal and two emergency controls. The normal stop is activated by depressing the "slow" button of the control panels. The emergency stop involves either pulling the "panic cord" or placing the controls in the stop position. Use of the panic cord cuts off the diesel motor and makes the lift totally inoperable.

---

guideline for the ski industry. If the section were to be interpreted as vesting the code with the force of law, serious constitutional problems would arise. *See State v. Dougall*, 89 Wn.2d 118, 570 P.2d 135 (1977); *State v. Reader's Digest Ass'n, Inc.*, 81 Wn.2d 259, 501 P.2d 290 (1972).

[8]For present purposes, we are assuming that an objection to the relevancy of the Riblet Tramway Operating Instruction Manual is the only problem involved in its admission.

Plaintiff contends that Steel incorrectly used one of the emergency stopping mechanisms the second time it was halted, causing the lift to stop abruptly and increasing the pendular motion of the chair. To prove this, several of plaintiff's witnesses testified that the second stop was more "jerky" and that they believed the entire system went "dead." Captain Hartvedt testified that he was forced to remain in the chair until someone from Crystal Mountain rode up to the engine room of the C–4 lift to restart the diesel engine. This evidence, of course, tends to prove that the "panic cord" emergency system was employed in stopping the tramway.

Steel maintained that he did not use the panic cord, but simply placed the controls in the stop position. He further stated the speed of the braking action of the lift, achieved by using the normal–slow stop, is not significantly different from that resulting from use of the emergency–stop control; he asserted that the only advantage of the emergency stop is that it frees the operator's hands by locking the system into a braking position. Finally, Steel stated that the reason the second stop was perceived as being more sudden was because the chair had been moving more quickly than it had been before the first stop. Donald Gore, another Crystal Mountain employee, corroborated Steel's statements.

Plaintiff wished to admit the Riblet manual to impeach Steel's testimony and to prove that use of one of the emergency braking systems results in a very abrupt stop. The pertinent section of the manual reads as follows:

To Stop Lift (Normal)
Push "Slow" button until lift stops. The engine will now be idling and the torque converter will be transmitting no torque to the drive shaft. Be sure to press the "Slow" button long enough to fully retard the throttle to idle position.
To Stop Lift (Emergency)
1. Press "Stop" button or pull emergency stop cord.
2. Set hand brakes.

■ It is difficult to understand how this information could be used to impeach Steel. Steel's testimony was not

inconsistent with the information contained in the Riblet manual; Steel admitted that the lift had a three-way braking capacity—the only dispute concerned the relative stopping speeds of the emergency and normal braking options. As the Riblet manual did not refer to the stopping speeds of the three mechanisms, it did not in any way contradict Steel's testimony and should not have been admitted for impeachment purposes. *McCoy v. Courtney*, 30 Wn.2d 125, 190 P.2d 732 (1948); E. Cleary, *McCormick's Handbook of the Law of Evidence* § 47 (2d ed. 1972).

The manual was also admitted as substantive evidence of the relative braking speeds of the emergency and normal systems. As stated above, the quoted material is not probative on this point. The trial court erred in admitting the manual as proof of the braking capacities of the chair lift.

The final reason for which the plaintiff intended to use the manual was as evidence of the standard of care required of tramway operators. The Riblet manual, the ANSI code, and Crystal Mountain's own employee handbook all require that an attendant be present during lift operations. Had the trial court admitted only those parts of the manual detailing operating procedures, we would have upheld its ruling against a cumulative evidence challenge. *See Toftoy v. Ocean Shores Prop., Inc.*, 71 Wn.2d 833, 431 P.2d 212 (1967); *State v. Ludwig*, 18 Wn. App. 50, 566 P.2d 946 (1977). However, we find that admission of the *entire* manual was inappropriate. The Riblet manual contains a great deal of information, much of it irrelevant for present purposes. We must conclude that the trial court abused its discretion in not requiring plaintiff to "edit" the manual prior to admitting it.

 Crystal Mountain asserts that the trial court erred in refusing to instruct the jury regarding its theory that Captain Hartvedt's actions in "inducing" plaintiff to ride the chair lift and his efforts to help her maintain a secure position on the chair constituted "intervening causes"

relieving it of responsibility for the accident.[9] We must first point out that we find nothing in the record to support defendant's contention that the captain induced plaintiff to mount the lift. Rather, it appears that plaintiff's decision to join him was made spontaneously without consulting anyone. Even assuming that defendant's assertions are supportable, the "inducement" would merely have been a concurrent cause of the accident. Crystal Mountain would be liable, assuming the other elements of the negligence case are proven, if its actions were *one* of the actual causes of the accident. *See State v. Jacobsen,* 74 Wn.2d 36, 442 P.2d 629 (1968); *Litts v. Pierce County,* 5 Wn. App. 531, 488 P.2d 785 (1971). Defendant was not entitled to an intervening cause instruction based on this theory.

Nor was the trial court incorrect in failing to instruct the jury regarding the second branch of defendant's intervening cause argument. Defendant maintains that had the captain not helped plaintiff steady her position on the chair, she would have dropped to the ground before the lift had carried her off the loading platform, thereby avoiding serious injury. Again, we note that the factual basis for this assertion is very thin; it appears that plaintiff herself had a fairly firm grasp on the chair and that even without the captain's assistance, would have been able to hold on for more than the few seconds it took for the chair to move past the bottom loading station. In any case, the captain's actions in attempting to assist plaintiff were such a natural response to the situation allegedly created by defendant's negligence as to be foreseeable as a matter of law. Because Captain Hartvedt's efforts to help plaintiff would supersede defendant's initial negligence only if they were unforeseeable, it was not error to refuse this instruction. *See Smith*

---

[9]Although the term "intervening cause" was used by defendant, it is clear that Crystal Mountain was actually seeking a "superseding cause" instruction. An intervening act which could reasonably be anticipated by the wrongdoer does not supersede the original negligence. *Smith v. Acme Paving Co.,* 16 Wn. App. 389, 558 P.2d 811 (1976); *Ward v. Arnold,* 52 Wn.2d 581, 328 P.2d 164 (1958).

*v. Acme Paving Co.,* 16 Wn. App. 389, 558 P.2d 811 (1976); *Ward v. Arnold,* 52 Wn.2d 581, 328 P.2d 164 (1958).

■ We will now discuss Crystal Mountain's dissatisfaction with a number of evidentiary rulings made by the trial court. In an attempt to prove that defendant's allegedly improper rescue attempt was responsible for her injury, plaintiff testified that she could have maintained her position on the chair lift until it reached the quarterway station on the mountain if the tramway had not stopped suddenly. Several of her witnesses also stated that prior to the stops, they believed that plaintiff was in a very stable position and that her situation appeared to be somewhat humorous and not a cause for great alarm. Defendant objected to this testimony on the grounds that it called for an opinion. These witnesses had ample opportunity to observe the scene; we find no abuse of discretion in admitting this testimony. *Arthurs v. National Postal Transp. Ass'n,* 49 Wn.2d 570, 304 P.2d 685 (1956); *Martin v. Huston,* 11 Wn. App. 294, 522 P.2d 192 (1974).

■ Plaintiff also testified concerning the causal relationship between her injuries and back problems she experienced during a subsequent pregnancy. Crystal Mountain contends that the trial court improperly permitted this testimony; they assert that matters concerning the etiology of a medical condition may generally only be proved by expert testimony. We agree and find that the trial court erred in overruling defendant's objection. *See O'Donoghue v. Riggs,* 73 Wn.2d 814, 440 P.2d 823 (1968); *Carlos v. Cain,* 4 Wn. App. 475, 481 P.2d 945 (1971); Annot., 66 A.L.R.2d 1082 § 8 (1959).

■ One of the elements of damage claimed in this case was for future wages. Defendant objected to the following testimony as being in violation of the hearsay rule:

[Plaintiff's counsel]: After the physical examination were you allowed to return—
[Plaintiff]: No.
[Plaintiff's counsel]: —to your work with SAS.

Here, it is clear that plaintiff must have been told by someone, either a doctor or an SAS official, that she could no longer work for the airline. Testimony based on an out–of–court statement and used to prove the truth of the matter asserted is itself considered hearsay. *Citizens Bank & Trust Co. v. Rudebeck,* 90 Wash. 612, 156 P. 831 (1916); *but see* 5 R. Meisenholder, Wash. Prac. § 381 for critique of *Citizens Bank* case. *See also Pollock v. Pollock,* 7 Wn. App. 394, 499 P.2d 231 (1972); *In re Merrill's Estate,* 326 Mich. 351, 40 N.W.2d 179 (1949); *Betts v. Betts,* 3 Wn. App. 53, 473 P.2d 403 (1970). The trial court erred in overruling defendant's objection.

Finally, we will comment upon problems which arose during this trial because of defense counsel's alleged violation of the trial court's order excluding witnesses from the courtroom. The trial court's initial order did no more than physically segregate the witnesses; nonetheless, the court was quite upset when it became apparent that defense counsel was summarizing the testimony of the witnesses who had already testified for the benefit of those to be called later. Although the trial court has great discretion in fashioning orders excluding witnesses, *see* 2 L. Orland, Wash. Prac. § 227, it must take pains to indicate the precise scope of the order. A more detailed ruling would have prevented the misunderstandings that arose here.

Reversed and remanded for a new trial.

Petrie and Andersen, JJ., concur.

Reconsideration denied September 7, 1978.

Review denied by Supreme Court January 19, 1979.