FILED
COURT OF APPEALS
DIVISION II

2015 MAR 31 AM 8: 34

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44847-5-II |
| Respondent, | (Consolidated with No. 44877-7-II) |
| v. | |
| SHARI ANNE BRENTIN, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 44877-7-II |
| Respondent, | |
| v. | |
| ANTHONY DAVID BRENTIN, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Shari and Anthony Brentin, tried jointly, each appeal their first degree

theft convictions[1] for stealing Suzanne Faveluke's money by color or aid of deception. The

Brentins argue that (1) the trial court violated CrR 3.3's time for trial rule by granting two

contested continuances for State's witness Teresa Loucks's unavailability, (2) the trial court

erroneously admitted evidence, (3) the trial court violated their right to present a defense by

excluding evidence of specific acts of Faveluke's generosity, and (4) the accomplice liability

---

[1] RCW 9A.56.030(1)(a).

statute is unconstitutionally overbroad. Finally, Anthony[2] argues that (5) insufficient evidence supports his first degree theft conviction. We affirm.

FACTS

A.      *Background*[3]

Shari Brentin and her husband Anthony Brentin jointly owned a financial services and insurance business. The Brentins pooled their financial resources together in joint bank accounts. In 2011, the Brentins' house had been foreclosed upon, which led them to live in a rental house. The landlord evicted them for failure to pay rent, and secured a judgment against them in the amount of $4,680.24.

By 2011, the Brentins had known Suzanne Faveluke for about five years. Faveluke was a rich, elderly woman who had a reputation for generously giving her money to nonrelatives. Faveluke made daily visits to her local bank branch for years. Two bank tellers testified that historically, Faveluke would never withdraw large sums of cash from the bank.

In 2011, Faveluke fell down a flight of stairs, injuring her leg and back, and requiring her to stay in a rehabilitation center for a few months. The Brentins visited Faveluke there almost daily. At the rehabilitation center, Faveluke gave Anthony, who was then a candidate for city council, $500 in five $100 bills for his campaign. After Faveluke returned home from the rehabilitation center, Shari and Anthony both assisted Faveluke on a daily basis.

---

[2] For clarity, we refer to Shari Brentin and Anthony Brentin as "the Brentins" collectively, and by their first names individually. We intend no disrespect.

[3] Because Anthony challenges the sufficiency of the evidence, we describe these facts in the light most favorable to the State. *See State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

In October of 2011, a local newspaper printed an article about Anthony's candidacy, criticizing him for having the outstanding $4,680.24 judgment against him. Also in October of 2011, Shari and Anthony talked with Faveluke about Anthony's campaign and his lack of campaign funding. Faveluke gave Anthony $4,900 by check for his campaign to purchase "signs, flyers, posters, etcetera." Verbatim Report of Proceedings (VRP) at 587.

Anthony testified that he had no intent to campaign, and had no campaign bank account, campaign manager, signs, or call centers. Anthony testified that he used Faveluke's money to pay the outstanding judgment.

On three separate occasions from October to December of 2011, Shari asked Faveluke for $1,000, $4,352, and $5,000 respectively. Shari told Faveluke that she needed this money to pay her veterinarian to save her sick cat's life, and that the veterinarian would accept only cash. Faveluke then made a series of withdrawals from the bank when a bank teller named Teresa Loucks was present. First, with Shari by Faveluke's side, Faveluke withdrew $1,000 in cash and told Loucks that the cash was intended for Shari's cat. Second, with Shari by Faveluke's side, Faveluke cashed a $5,000 check and told Loucks that the cash was intended for Shari's cat. Third, with Shari by her side, Faveluke withdrew $3,400 in cash and took out a $952 cashier's check for Faveluke's insurance bill, for a total of $4,352.[4] Finally, while Shari was waiting out in a car, Faveluke requested $5,000 in cash and told Loucks that the cash was intended for Shari's cat. Loucks, who was growing suspicious, convinced Faveluke to take a $5,000 cashier's

---

[4] The record is unclear as to whether Shari received all of this money or whether the $952 really paid Faveluke's insurance bill. The record is also unclear as to what kind of insurance the $952 was for. These matters are not important to the resolution of this case.

check instead of cash, and wait one day before cashing it. But as soon as Faveluke returned to Shari with the cashier's check, Shari and Faveluke drove to another bank, where Faveluke cashed the check and gave Shari the $5,000.

The veterinarians who treated Shari's cat testified at trial that they accepted credit cards as well as cash, and that Shari spent only approximately $2,100 in veterinarian bills. Shari admitted to Detective Plaza that "[Faveluke] probably believed the money was going towards the vet bills," but that Shari spent Faveluke's money on, among other things, $2,000 for the Brentins' business office lease and $2,900 in rent. VRP at 613. Shari also told Detective Plaza that she had tried to return the money to Faveluke but that Faveluke refused and said she could keep it.

B.    *Police Investigation and Charges*

Loucks tried to contact the police, adult protective services, and her bank's fraud department about Faveluke's withdrawals. Detective Plaza then began an investigation, which included taking a written statement from Faveluke in December of 2011. Faveluke dictated the statement to Detective Plaza, who wrote it down. Faveluke signed the bottom of each page of the statement. The statement included the following:

> After falling down my stairs, [Anthony] and Shari started coming over every day to help me. . . . Shari and [Anthony] would help around the house and help me shower, make sure I ate, etcetera.

> On October 12th, 2011, [Anthony] was at my house and . . . said that campaign signs cost money. Shari then said if we had money, they would buy nice signs, too. After we talked for a while, I decided to help [Anthony] by donating to his campaign. I wrote [Anthony] a check, Check Number 1389, for $5,000 but kept $100.00 for myself, so I gave [Anthony] $4,900. This money was to be used solely for his campaign and nothing else. He was supposed to buy signs, flyers, posters, etcetera. I later found out he did not use my money for any of that.

4

On November 16th, 2011, Shari stopped by my house and she was crying. She told me her cat had cancer and it was dying. She said the vet could save the cat, but it would cost $1,000.00. She told me the vet would only take cash. . . . I gave Shari the money. I was told the entire amount was for the vet bill.

On November 29th, 2011, Shari came by my house again. She said her cat needed more surgery or her cat would die. She told me again that her vet only took cash. She drove me to the bank and I withdrew $4,352 in cash. I gave her the money, believing that the entire amount was to be used to pay the vet.

On December 7th, 2011, Shari came to my house again. She said the cat needed more work done. At one point, she was on the telephone with who she said was the vet office. After she hung up, she told me the vet said either she paid them $5,000 in cash or they would put her cat to sleep. . . . I agreed to give her the money. She took me to the bank and I tried to withdraw the cash but was told the bank did not have it. I got a cashier's check instead. The bank lady asked me to wait one day before I cashed it, and I said okay. When we got to my car, Shari said we should look for a bank to cash the check at. We went to a bunch of banks before we found one that would cash it. After I gave her the money, she told me not to tell [Anthony] about it. She said [Anthony] would not agree with her spending $5,000 on a cat. I promised not to tell. I gave her the money thinking it would all be used on an operation for Shari's cat.

VRP at 587-89. The State charged Anthony and Shari, as principles and accomplices of one another, with first degree theft for stealing Faveluke's money by color or aid of deception. The State alleged a common scheme or plan. The State charged aggravating factors against both Anthony and Shari for committing the offense against a particularly vulnerable victim, and for committing a major economic offense.

C.    *Continuances*

The Brentins were tried jointly. The State requested, and the trial court granted, three uncontested continuances of the trial. The third of these uncontested continuances was because

5

No. 44847-5-II
Cons. wi No. 44877-7-II

Loucks was unavailable to testify due to illness. After these three continuances, trial was
scheduled for December 3, 2012 with a commencement date[5] of October 25, 2012.

On November 29, 2012, the State requested another continuance, due to Loucks's
continued unavailability to testify. The State's affidavit explained:

> I have been previously contacted in October by Frank Najar, corporate security and
> legal liaison for US Bank. Mr. Najar informed me that [Loucks] had been
> diagnosed with a serious medical condition that required immediate medical care,
> including surgery. Mr. Najar informed me that this surgery would incapacitate her
> and render her unavailable for trial. Due to this, the case was previously postponed.
>
> I was recontacted by Mr. Najar on November 16th. He informed me that [Loucks]
> was required to undergo further surgery on November 30th, and would therefore be
> medically unable to work or appear in court for some time thereafter. He indicated
> that the prognosis is that [Loucks] would recover and be able to testify
> approximately 1 month after her surgery.

Clerk's Papers (CP) (Anthony) at 80.

The Brentins orally objected to continuing the trial, but did not argue that the continuance
caused them prejudice. The trial court found good cause for a continuance and granted the
State's motion, continuing the trial until January 7, 2013.

On January 3, the State requested another continuance due to Loucks's continued
unavailability. The State's affidavit restated the facts in its previous request and added the
following:

> I spoke with Mr. Najar again on December 26th and 28th to obtain updated
> information on [Loucks]'s status. He related that her recovery is taking more time
> than initially expected, and that she is currently still occupied with an extensive
> medical regimen to include physical therapy and other recovery efforts. The
> lingering effects of the surgery are also currently affecting her memory and recall
> of events. He also indicated that [Loucks]'s current physical condition is frail, but

---

[5] CrR 3.3(b)(2) provides that out-of-custody defendants "shall be brought to trial" within 90 days
of the commencement date.

6

that her doctors do indicate that her recovery, though likely to not be complete, is
proceeding better than the vast majority of patients in her situation.

CP (Anthony) at 83-84.

The Brentins again objected. The trial court found good cause and granted another

continuance, but ordered the State to provide documentation from Loucks's physicians regarding

her medical condition. The trial court did not set a new trial date, but rather set a January 28

hearing to set the trial date. At the January 28 hearing, the trial court set the trial for March 18,

2013. In February, the State eventually filed a sealed document explaining Loucks's medical

condition. Trial began on March 19.

D.     Objections to the State's Evidence

    1. Loucks's Testimony

    At trial, Loucks testified that on three of Faveluke's withdrawals, Faveluke intended the

withdrawn money to go to Shari's cat. A voir dire in aid of objection revealed Loucks's

testimony was based on Faveluke's out-of-court statements to Loucks that Faveluke intended the

withdrawn money to go to Shari's cat. The Brentins objected to this testimony as hearsay, and

the trial court overruled the objection.[6]

---

[6] The trial court's rationale for overruling the objection appears to be that because Loucks
testified that the withdrawn money *was* for Shari's cat, rather than that *Faveluke said* that the
withdrawn money was for Shari's cat, Loucks was not testifying to Faveluke's out-of-court
statements, even though her testimony was based on Faveluke's out-of-court statements. This
rationale is incorrect. *See Egede-Nissen v. Crystal Mountain, Inc.*, 21 Wn. App. 130, 145, 584
P.2d 432 (1978), *aff'd and modified by* 93 Wn.2d 127 (1980).

Loucks also testified that in response to Faveluke's suspicious withdrawals, Loucks had tried to contact the police, adult protective services, and the bank's fraud department. Shari objected to this testimony as improper opinion evidence, and the trial court overruled the objection.

2. *Faveluke's Testimony and Written Statement*

Faveluke testified at the Brentins' trial when she was 75 years old. Her testimony revealed that she struggled to remember the events in the case. At one point she testified her *own* cat's name was Brady, but then testified Shari's cat's name was Brady, and then testified she could not be sure of that. Faveluke could not remember when she met Anthony or Shari. She could not remember how much money she gave for Shari's cat. She could not remember whether she had given Shari money for Shari's cat twice or three times. She was confused as to whether the $4,900 she gave Anthony was intended for Anthony's campaign or for Shari's cat.

Faveluke testified that she had memory problems at the time of the trial, and that the older she gets the worse her memory seems to become. She testified at different times that she could not remember whether her memory was better at the time of the written statement or at trial, that her written statement would help her remember events, and that her memory of the events were better at trial than on the day she made the written statement. She testified that she would need to read her written statement three times to remember it.

The State moved to allow Detective Plaza to read Faveluke's written statement verbatim to the jury, and the Brentins objected. The trial court granted the State's motion, ruling that Faveluke's written statement fell under the recorded recollections exception to the hearsay rule. Detective Plaza read Faveluke's full written statement to the jury.

8

E.    *Limitations on the Brentins' Evidence*

Anthony testified at trial. Anthony's defense was that Faveluke saw the newspaper article criticizing Anthony for the judgment against him, and provided Anthony with unsolicited money, not for campaigning, but rather for benefitting his campaign's publicity by paying off his $4,680.24 judgment. Anthony testified that he had planned to pay Faveluke back, but that Faveluke insisted it was a gift and that no repayment was needed.

Shari did not testify at trial. Her defense was that Faveluke gave Shari unsolicited money for her cat, that Shari spent some of that money on the veterinarian, and that Shari then offered the remaining money to Faveluke. Shari argued that Faveluke refused to take the money back.

To support their defenses, the Brentins attempted to admit evidence of both Faveluke's reputation for generosity and specific acts of her generosity. The Brentins sought to admit evidence of, among other things, (1) Faveluke's $20,000 gift to the owners of a restaurant she frequented; (2) Faveluke's offer to pay for the dental care of a worker at the restaurant (no money was actually given); (3) Faveluke's gift of money to Anthony's fire department; (4) Faveluke's gifts of hundreds of thousands of dollars to other organizations, and (5) Faveluke's gifts of tens of thousands of dollars to art students. The Brentins made an offer of proof that they knew when the $20,000 gift to the restaurant owners occurred, and, specifically, that Anthony knew about this gift at the time he took money from Faveluke. But the Brentins had no evidence showing either when the other gifts occurred or that the Brentins knew about the other gifts.

The trial court ruled that it would admit only evidence of Faveluke's reputation for generosity and those specific acts of Faveluke's generosity that the Brentins knew about at the time they received Faveluke's money because this evidence was relevant to negate "color or aid of deception" (by showing that the Brentins had an apprehension of Faveluke's generosity). The trial court excluded all other evidence of Faveluke's specific acts of generosity.

Thus, the trial court ruled that evidence about Faveluke's reputation for generosity and the specific act of the $20,000 gift to the restaurant owners was admissible. But the trial court ruled that because the Brentins made no showing that they knew about any of Faveluke's other specific acts of generosity, evidence of those other specific acts would not be admitted. Further, the trial court did not allow the Brentins to cross-examine witnesses about the excluded specific acts of Faveluke's generosity. Evidence about Faveluke's reputation for generosity and the $20,000 gift were admitted through testimony.

F.    *Conviction*

A jury found both Shari and Anthony guilty of one count of first degree theft. Shari and Anthony appealed their convictions, and we consolidated their appeals.

ANALYSIS

I. TIME FOR TRIAL

The Brentins argue that the trial court violated their CrR 3.3 timely trial rights by granting the State two continuances based upon a witness's unavailability, which pushed the trial date beyond the timely trial period allowed by CrR 3.3. The Brentins argue that the trial court

could not grant the State's two requested continuances because the State failed to subpoena the

unavailable witness. We disagree.[7]

CrR 3.3 governs the time for trial in superior court criminal proceedings. CrR 3.3

provides that out-of-custody defendants "shall be brought to trial" within 90 days of the

commencement date. CrR 3.3(b)(2). Because the commencement date here was October 25,

2012, the last allowable date for trial was January 23, 2013. The Brentins' trial commenced on

March 19 because the trial court granted two State motions for continuances. CrR 3.3 excludes

properly granted continuances from the time-for-trial period. CrR 3.3(e)(3). Therefore, if the

continuances were proper under the rule, then the Brentins' trial was timely.

We review a trial court's grant or denial of a continuance for manifest abuse of

discretion. *State v. Cannon*, 130 Wn.2d 313, 326, 922 P.2d 1293 (1996). A manifest abuse of

discretion exists only when no reasonable person would take the view adopted by the trial court.

*State v. Woolworth*, 30 Wn. App. 901, 906, 639 P.2d 216, 219 (1981).

CrR 3.3(f)(2) states in part:

> On motion of . . . a party, the court may continue the trial date to a specified date
> when *such continuance is required in the administration of justice and the
> defendant will not be prejudiced in the presentation of his or her defense.*

(Emphasis added.) Under CrR 3.3(f)(2), a trial court may grant a continuance where a material

witness is unavailable if (1) there is a valid reason for the unavailability, (2) the witness will be

---

[7] The State argues this issue is waived under CrR 3.3(d)(3) because while the Brentins objected, they did not file a written motion. *State v. Chavez-Romero*, 170 Wn. App. 568, 581, 285 P.3d 195 (2012). We assume without deciding that the issue is not waived because it does not affect the result.

available within a reasonable time frame, and (3) the defendant incurs no substantial prejudice from the continuance. *State v. Nguyen*, 68 Wn. App. 906, 914, 847 P.2d 936 (1993). The issuance of a subpoena can also be an important factor in determining whether a continuance is proper.[8] *State v. Wake*, 56 Wn. App. 472, 476, 783 P.2d 1131 (1989).

A.    *First Contested Continuance*

Here, the State requested a continuance on November 27, declaring that on November 16 the State learned that Loucks had a serious medical condition and needed immediate surgery on November 30 and that the surgery would prevent her from testifying for approximately one month. The Brentins provided no argument below or on appeal that this continuance prejudiced them in any way. Because Loucks's unavailability was due to a serious medical condition that required surgery, there was nothing the State could have done to secure the witness's attendance, and a subpoena would have been futile. Thus, a reasonable person could take the view that a valid reason for Loucks's unavailability existed, that Loucks would be available within a reasonable time, and that the Brentins would not be prejudiced. Therefore, the trial court did not commit a manifest abuse of discretion by granting the first continuance.

---

[8] Anthony argues the trial court may not grant the State a continuance for failure to secure a material witness's attendance at trial if the State has not followed the standards of due diligence, which require the issuance of subpoenas to witnesses. The brief of appellant at pages 18 to 19 cites to *City of Seattle v. Clewis*, 159 Wn. App. 842, 847, 247 P.3d 449 (2011) and *State v. Adamski*, 111 Wn.2d 574, 577, 761 P.2d 621 (1988). But *Clewis* cited to *Adamski*, and *Adamski* interpreted JuCR 7.8 when it still explicitly contained the "due diligence" standard. *See State v. Bible*, 77 Wn. App. 470, 473, 892 P.2d 116 (1995). The "due diligence" standard was amended out of CrR 3.3 in 1979. *Compare* former CrR 3.3(e)(2)(ii)(1978) *with* former CrR 3.3(f)(2) (1979) *with* CrR 3.3 (f)(2). The due diligence standard was amended out of JuCR 7.8 by 2004. *Compare* former JuCR 7.8(e)(2)(ii) (2003) *with* former JuCR 7.8(f)(2)(2004) *with* JuCR 7.8(f)(2). Thus, we hold that while issuance of a subpoena is an important factor for this court's consideration, *Clewis* and *Adamski's* holdings based on "due diligence" do not apply.

B.      *Second Contested Continuance*

The State requested another continuance on January 3, claiming that on December 26 and 28, the State learned that Loucks's recovery was taking longer than expected, she still had an extensive medical regimen, and that the lingering effects of her surgery were affecting her memory. But the State also said that it learned Loucks was "proceeding better than the vast majority of patients in her situation." CP (Anthony Brentin) at 84. The Brentins provided no argument below or on appeal that this continuance prejudiced them in any way. Because Loucks's unavailability was due to a serious medical condition and her memory was affected by the lingering effects of the surgery, there was nothing the State could have done to secure her attendance, and a subpoena would have been futile. Thus, a reasonable person could take the view that there was a valid reason for Loucks's unavailability, that Loucks would be available within a reasonable time, and that the Brentins would not be prejudiced. Therefore, the trial court did not commit a manifest abuse of discretion by granting the first continuance.

Because the trial court did not abuse its discretion in granting either continuance, the continuances are excluded from the time for trial period. Thus, the Brentins' trial was timely under CrR 3.3.

## II. HEARSAY

The Brentins argue that the trial court violated the hearsay rule by admitting Loucks's testimony of Faveluke's out-of-court statements that she intended to use the withdrawn money for Shari's cat, and Detective Plaza's testimony that read Faveluke's out-of-court written statement to the jury. We disagree.

13

"Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Under ER 802, hearsay is inadmissible unless it comes within an exception established by statute, court rules, or common law. *State v. Kirkpatrick*, 160 Wn.2d 873, 881, 161 P.3d 990 (2007).

We review the trial court's determination of whether a hearsay exception authorizes the admission of hearsay for an abuse of discretion. *State v. Woods*, 143 Wn.2d 561, 595, 23 P.3d 1046 (2001). An abuse of discretion exists only when no reasonable person would take the position adopted by the trial court. *State v. Atsbeha*, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001). Furthermore, "[a] party may present a ground for affirming a trial court decision which was not presented to the trial court if the record has been sufficiently developed to fairly consider the ground." RAP 2.5(a).

A.      *Then Existing Mental, Emotional, or Physical Condition*

The Brentins argue that the trial court erred by admitting Loucks's testimony of Faveluke's out-of-court statements that she intended to use the money she withdrew for Shari's cat. The State argues that Faveluke's out-of-court statements were not hearsay because they were not offered in evidence to prove the truth of the matter asserted, and that if they were hearsay, they were still admissible under ER 803(a)(3)'s exception to the hearsay rule as statements of then existing mental condition. We hold that Faveluke's statements were hearsay, but that they were admissible under ER 803(a)(3)'s exception to the hearsay rule.

ER 803(a)(3) allows admission of hearsay if it is a "then existing mental, emotional, or physical condition" defined as:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as *intent*, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

(Emphasis added.)

Here, the State offered Faveluke's out-of-court statements that she intended to use the money for Shari's cat in evidence to prove the truth of the matter asserted: that Faveluke intended to use the money for Shari's cat. Thus, the statements were hearsay. But Faveluke's statements of her intent for use of the money were made as she was withdrawing the money. Thus, Faveluke's statements were statements of Faveluke's then existing state of mind, i.e., her intent, and were admissible as statements of an existing mental condition under ER 803(a)(3)'s exception to the hearsay rule.

B.      *Recorded Recollection*

The Brentins argue that the trial court erred by admitting, as a recorded recollection, Faveluke's written statement to the jury. The Brentins contend that the trial court lacked sufficient foundation to admit this statement. We disagree.

ER 803(a)(5) provides an exception to the hearsay rule for a "recorded recollection," defined as:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly.

15

Admission of a recorded recollection under ER 803(a)(5) is proper when the following requirements are met: (1) the record pertains to a matter about which the witness once had knowledge, (2) the witness has an insufficient recollection of the matter to provide truthful and accurate trial testimony, (3) the record was made or adopted by the witness when the matter was fresh in the witness's memory, and (4) the record reflects the witness's prior knowledge accurately. *State v. White*, 152 Wn. App. 173, 183, 215 P.3d 251 (2009). The Brentins challenge only the second and third requirements.

Regarding the second requirement, Faveluke's testimony demonstrated that she had insufficient recollection of the details of her interactions with the Brentins to provide truthful and accurate trial testimony about them. Regarding the third requirement, Faveluke gave the statement to police in December of 2011, about events occurring in the fall of 2011. Thus, the record was made or adopted by Faveluke when the matter was fresh in her memory. We hold the trial court did not abuse its discretion by admitting Faveluke's written statement as a recorded recollection under ER 803(a)(5)'s exception to the hearsay rule.

## III. OPINION TESTIMONY

The Brentins argue that the trial court denied them a fair trial by admitting Loucks's testimony that she called the police, adult protective services, and her bank's fraud department in response to Faveluke's withdrawals. They argue that this evidence was improper opinion testimony as to their guilt. We disagree.

We review claims of constitutional error de novo. *State v. Iniguez*, 167 Wn.2d 273, 281, 217 P.3d 768 (2009). The Sixth Amendment to the United States Constitution and article I, section 21 of the Washington Constitution guarantee the right to a trial by jury. *State v. Elmore*,

16

154 Wn. App. 885, 897, 228 P.3d 760 (2010). In general, witnesses may not comment, directly or indirectly, on the defendant's guilt or veracity because such testimony invades the jury's exclusive province. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion).

Loucks testified that she called the police, adult protective services, and the fraud department because she had grown suspicious of Faveluke's unusual large withdrawals of money. But the State never asked about, nor did Loucks opine on, Faveluke's veracity or the Brentins' guilt. Rather, Loucks testified only that she called various authorities because of a general suspicion as to Faveluke's large transactions.

The Brentins' reliance on *State v. Black*, 109 Wn.2d 336, 745 P.2d 12 (1987) and *State v. Johnson*, 152 Wn. App. 924, 219 P.3d 958 (2009) is not persuasive. In both of these cases, unlike here, the witness gave an opinion on the veracity of the victim's allegations against the defendant, thus commenting on the defendant's guilt. In *Black*, the expert testified, "*There is a specific profile for rape victims and [the alleged rape victim] fits in.*" *Black*, 109 Wn.2d at 339. In *Johnson*, the trial court admitted non-expert out-of-court statements from the defendant's wife, conveying her belief that the victim told the truth. 152 Wn. App. at 931; *see also State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992) (a counselor testified that he believed the victim was not lying).

Here, Loucks's testimony commented on neither Shari's or Anthony's guilt nor Faveluke's veracity. Instead, Loucks stated that she had concerns about Faveluke's unusual withdrawals and called the authorities. Thus, Loucks did not comment, directly or indirectly, on the defendants' guilt or veracity, and the Brentins' claim fails.

IV. RIGHT TO PRESENT A DEFENSE

The Brentins argue that the trial court violated their right to present a defense when it ruled that they could not present evidence of Faveluke's specific acts of generosity. We disagree.

A.     *Standard of Review*

The United States Constitution and the Washington State Constitution guarantee the right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I § 22; *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). This constitutional right is not absolute and does not extend to irrelevant or inadmissible evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); *State v. Aguirre*, 168 Wn.2d 350, 363, 229 P.3d 669 (2010) (although defendant has "a constitutional right to present a defense, the scope of that right does not extend to the introduction of otherwise inadmissible evidence"); *State v. Mee Hui Kim*, 134 Wn. App. 27, 41, 139 P.3d 354 (2006) (defendant has right to present a defense "'consisting of relevant evidence that is not otherwise inadmissible'") (quoting *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992)). Accordingly, where evidence is inadmissible, excluding that evidence does not violate a defendant's constitutional right to present a defense.

We review a trial court's rulings on evidentiary matters for an abuse of discretion. *State v. Myers*, 133 Wn. 2d 26, 34, 941 P.2d 1102 (1997). If the excluded evidence was relevant, we balance "[t]he State's interest in excluding prejudicial evidence" against "'the defendant's need for the information sought,' and relevant information can be withheld only 'if the State's interest

18

outweighs the defendant's need.'" *Jones*, 168 Wn.2d at 720 (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)).

B.      *Admissibility of Faveluke's Specific Acts of Generosity*

The Brentins challenge the trial court's refusal to allow the introduction of Faveluke's generosity into evidence, arguing that they should have been able to ask Faveluke about her acts of generosity on cross-examination to rebut the bank tellers' testimony that Faveluke never withdrew cash from her bank account and that they should have been able to admit affirmative evidence of Faveluke's generosity because the evidence was an essential element of their defense. We disagree.

ER 404(a) states in part:

> **(a) Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
>    . . . .
>
> (2) *Character of Victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same.

ER 405 states:

> **(a) Reputation.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross examination, inquiry is allowable into relevant specific instances of conduct.
>
> **(b) Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

1. ER 405(a) *Specific Acts of Generosity on Cross-Examination*

The Brentins argue that ER 405(a) allowed them to cross-examine Faveluke about her specific acts of generosity to rebut the State's evidence, derived from bank tellers' testimony, that Faveluke never withdrew cash from her bank account. We hold that ER 405 does not apply here, and that ER 403 prohibits cross-examination of Faveluke's specific acts of generosity.

Character evidence is limited to that evidence which is admitted "for the purpose of proving action in conformity therewith on a particular occasion." ER 404(a). Thus, where evidence is admitted for a purpose other than to prove action in conformity therewith on a particular occasion, it is not character evidence, and ER 404 and ER 405's restrictions do not apply. *See State v. Kelly*, 102 Wn.2d 188, 195-96, 685 P.2d 564 (1984); *United States v. Keiser*, 57 F.3d 847, 853 (9th Cir. 1995); 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE §405.1, at 191 (2014-15 ed.).

Here, the Brentins argue that ER 405(a) allowed them to elicit testimony from Faveluke on cross examination about her specific acts of generosity not for the purpose of proving conformity with that generosity on a specific occasion, but rather for the purpose of proving that Faveluke withdrew cash from the bank. Thus, the Brentins do not seek to elicit Faveluke's testimony about her generosity for the purpose of showing conformity with that generosity on a particular occasion, and ER 404 and ER 405 do not apply.

Therefore, to determine admissibility we look to ER 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Here, Faveluke's specific acts of generosity did not directly contradict the bank tellers' testimony about her banking habits, and thus, had minimal, if any, probative value to show the amount of cash she withdrew from her bank. Faveluke's specific acts of generosity were cumulative of the admitted evidence of Faveluke's reputation for generosity and the $20,000 gift that was admitted. Any testimony elicited from Faveluke about the other specific acts of generosity would have confused the issues by introducing transactions and parties unrelated to the case. In addition, such testimony would have been confusing and would have wasted time. Furthermore, the Brentins were able to argue at trial that Faveluke's generously gave the Brentins the allegedly stolen money as a gift.

Thus, we hold that because the minimal probative value of the evidence was substantially outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence, it was inadmissible under ER 403, and the trial court did not err by prohibiting the Brentins from questioning Faveluke about these acts on cross-examination. Because the State's interest in excluding this evidence to avoid confusing the jury greatly outweighs the defendant's need for the information sought, its exclusion did not violate the Brentins' constitutional right to present a defense.

2. *ER 405(b): Essential Element of the Brentins' Defense*

The Brentins argue that affirmative evidence of Faveluke's specific acts of generosity was admissible under ER 405(b) because Faveluke's generosity is an essential element of the Brentins' defense. We disagree.

21

Affirmative evidence of specific instances of conduct may be admitted only if the person's character is an essential element of a charge, claim, or defense. *Kelly*, 102 Wn.2d at 197. For character to be an essential element, it must itself determine the parties' rights and liabilities. 102 Wn.2d at 197.

Here, the State did not dispute that Faveluke voluntarily and generously gave the Brentins her money. Rather, the State argued that the Brentins intentionally deceived Faveluke as to the *purpose* of her generous gifts. ER 405(b). Thus, because Faveluke's character for generosity does not itself determine the Brentins' rights and liabilities under the first degree theft statute, it is not an essential element of any charge, claim, or defense to the crime with which the Brentins were charged. Accordingly, the excluded specific acts of Faveluke's character for generosity are not admissible under ER 405(b). Because the State's interest in excluding the specific instances of conduct to avoid confusing the jury greatly outweighed the defendant's minimal need for the information sought, its exclusion did not violate the Brentins' constitutional right to present a defense.

## V. ACCOMPLICE LIABILITY STATUTE

The Brentins argue that Washington's accomplice liability statute, RCW 9A.08.020, is unconstitutionally overbroad in violation of the First Amendment to the United States Constitution[9] because it does not define or limit the term "aid," and thus, criminalizes protected speech that the actor knows will encourage crime, even if the actor has no intent to promote or further crime. The Brentins ask us to revisit and reverse our decisions rejecting this identical

---

[9] U.S. CONST. amend. I.

argument in *State v. Coleman*, 155 Wn. App. 951, 961-62, 231 P.3d 212 (2010) and *State v. Ferguson*, 164 Wn. App. 370, 375-76, 264 P.3d 575 (2011). We decline to do so.

We presume that statutes are constitutional and we review challenges to them de novo. *State v. Lanciloti*, 165 Wn.2d 661, 667, 201 P.3d 323 (2009). Under RCW 9A.08.020(3), a person is an accomplice of another's crime if:

> (a) With knowledge that it will promote or facilitate the commission of the crime, he or she:
>
> . . . .
>
> (ii) Aids or agrees to aid such other person in planning or committing it.

A. *The Law as Established by* Coleman *and* Ferguson

In *Coleman*, Coleman argued that the accomplice liability statute "criminalize[d] speech, press, or assembly activity that the actor *knows* will encourage vandalism, traffic obstruction, or other crimes, even if the actor has no *intent* to promote or further crime." 155 Wn. App. at 960 (emphasis added). Division One of this court held that the accomplice liability statute was not unconstitutionally overbroad because it "requires the criminal mens rea to aid or agree to aid the commission of a specific crime with knowledge the aid will further the crime," thus showing that the speech at issue was *intended* to and was likely to produce or incite imminent lawless action. 155 Wn. App. at 960-61. We adopted this reasoning in *Ferguson*. 164 Wn. App. at 375-76.

B. *The Brentins' Challenges to* Coleman *and* Ferguson

The Brentins acknowledge *Coleman* and *Ferguson*, but argue that the cases were wrongly decided for two reasons. We reject both arguments.

First, the Brentins argue that because the trial courts' reliance on the mens rea requirement does not meet the federal *Brandenburg* standard, the statute criminalizes speech other than that "'directed to inciting or producing imminent lawless action.'" Br. of Appellant (Anthony Brentin) at 26 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969)). But the Brentins are mistaken. In *Ferguson*, we did address the *Brandenburg* standard and concluded that "[b]ecause the [accomplice liability] statute's language forbids advocacy directed at and likely to incite or produce imminent lawless action, it does not forbid the mere advocacy of law violation that is protected under the holding of *Brandenburg*." *Ferguson*, 164 Wn. App. at 376. We once again reject this constitutional challenge. *See State v. McCreven*, 170 Wn. App. 444, 484-85, 284 P.3d 793 (2012) (rejecting the same argument and following *Ferguson*), *review denied*, 176 Wn.2d 1015 (2013).

Second, the Brentins argue that this court in *Coleman* and *Ferguson* erroneously relied on cases involving conduct, whereas the act of aiding can involve pure speech. We recently rejected this argument in *State v. Holcomb* by holding that the accomplice liability statute cannot punish pure speech because it "has been construed to apply solely when the accomplice acts with knowledge of the specific crime that is eventually charged, rather than with knowledge of a different crime or generalized knowledge of criminal activity. And the required aid or agreement to aid the other person must be 'in planning or committing [the crime].'" 180 Wn. App. 583, 590, 321 P.3d 1288, *review denied*, 180 Wn.2d 1029 (2014) (internal citations omitted) (alteration in original) (quoting RCW 9A.08.020(3)(a)(ii)). Thus, the accomplice liability statute is not unconstitutionally overbroad.

VI. INSUFFICIENT EVIDENCE

Anthony argues that insufficient evidence supports his first degree theft conviction because the State failed to produce sufficient evidence that he stole more than $5,000 by color or aid of deception. We disagree.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the crime's essential elements beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a trier of fact can draw from that evidence. 119 Wn.2d at 201.

Under RCW 9A.56.020(1)(b), "theft" means:

By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services.

Under RCW 9A.56.030(1)(a), a person commits first degree theft by stealing "[p]roperty or services which exceed(s) five thousand dollars in value."

Here, evidence at trial supports that Faveluke provided Anthony with $5,400 for his campaign: her testimony provides evidence that she gave Anthony $500 in five $100 bills at the rehabilitation center, and her written statement supports that she gave Anthony $4,900 by check. Anthony testified that he had no intent to campaign, and no campaign bank account, campaign manager, signs, or call centers. Anthony also testified that Faveluke's money was used to pay off his debt on the first rental house, for which he owed $4,680.24. Taking this evidence in the light most favorable to the State, this is sufficient evidence that Anthony took $5,400 of Faveluke's money by deceiving her into falsely believing that the $5,400 was for his campaign,

25

when he had no intent to campaign. Thus, there is sufficient evidence to convict him of first

degree theft.[10]

We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_Worswick, J._

Worswick, J.

We concur:

_Bjorgen, A.C.J._

Bjorgen, A.C.J.

_Melnick, J._

Melnick, J.

---

[10] Because we hold that sufficient evidence supports Anthony's conviction as a principal, we
need not consider whether sufficient evidence supports his conviction as an accomplice. *See
State v. McDonald*, 138 Wn.2d 680, 686-87, 981 P.2d 443 (1999).